JANETTE WIPPER (#275264)
  Chief Counsel
MELANIE L. PROCTOR (#228971)
  Associate Chief Counsel
ANDREW S. HUANG (#193730)
  Associate Chief Counsel
MARTHA L. GOMEZ
  Senior Staff Counsel (#274024)
DEPARTMENT OF FAIR EMPLOYMENT
  AND HOUSING
2218 Kausen Drive #100
Elk Grove, CA 95758
Telephone:  (916) 478-7251
Facsimile:   (888) 382-5293

Attorneys for Plaintiff
Department of Fair Employment and Housing
(Fee Exempt, Gov. Code, § 6103)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, an agency of the State of California,<br><br>                                    Plaintiff,<br><br>vs.<br><br>SILICON VALLEY GROWTH SYNDICATE I, L.L.C.; SILICON VALLEY GROWTH SYNDICATE FUND I, L.P.; INTERNATIONAL DIRECT MAIL CONSULTANTS, INC., d.b.a. INTERNATIONAL DIRECT MARKETING CONSULTANTS, INC.; LEE WILLIAM MCNUTT; WILLIAM BUNKER; RUSSELL LEWIS; and DOES ONE through TEN, inclusive,<br><br>                                    Defendants.<br><br>JANE DOE,<br><br>                         Real Party in Interest. | Case No. 19-cv-04204-RS<br><br>**FIRST AMENDED CIVIL RIGHTS COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF BECAUSE OF HARASSMENT BASED ON SEX**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Department of Fair Employment and Housing ("the Department" or "DFEH"), brings this civil rights enforcement action in its own capacity, and on behalf of real party in interest Jane Doe, against Silicon Valley Growth Syndicate I, L.L.C.; Silicon Valley Growth Syndicate Fund I, L.P.; International Direct Mail Consultants, Inc., d.b.a. International Direct Marketing Consultants, Inc.; Lee William McNutt; William Bunker; Russell Lewis; and Does One through Ten (collectively, "Defendants," "Syndicate," "Silicon Valley partners," "partners"), inclusive, to redress sexual harassment in employment and professional relationships:

## INTRODUCTION

1. Under California law, all persons are guaranteed a workplace and a professional environment free from sexual harassment and sexual assault. Investment groups and investors like Defendants have been bound by these anti-harassment laws not only in their employment relationships, but also in their professional relationships for decades. It is a nonnegotiable part of doing business in California.

2. Since its founding in 2012, Defendant Silicon Valley Growth Syndicate and its partners have invested tens of millions of dollars in local start-up businesses in California. As of 2017, forty-two of its sixty-five investments were made in California-based businesses.[1] Nearly sixty percent of those businesses are or were headquartered in Silicon Valley. On or around May 2018, the Silicon Valley group invested $10.4 million in a healthcare start-up company based in San Francisco, California.

3. The Silicon Valley partners have continued their current investments and their search for new ones in California businesses. On at least two occasions in 2017, Defendant McNutt visited local start-up accelerators Y Combinator and 500 Startups looking for co-investors in San Francisco,

---

[1] Investments include but are not limited to: GearLaunch (www.gearlaunch.com); Cozymeal (www.cozymeal.com); BuildFire (buildfire.com); Buzzstarter (www.buzzstarter.biz); 2RedBeans (www.2redbeans.com); SOCI, Inc. (www.meetsoci.com); OnFleet (onfleet.com); Hint Health (www.hint.com); StudySoup (studysoup.com); MentorCloud (mentorcloud.com); Cargo Chief (www.CargoChief.com); Catalia Health (cataliahealth.com); VOIQ (www.voiq.com); Blueboard (www.blueboard.com); Zerply (zerply.com); Tray.io (tray.io); Myagi (myagi.com); EasyPaint (www.easypaint.com); PlotBox (www.plotbox.io); Dil Mil, Inc. (dilmil.co); Avanoo (www.avanoo.com).

California. He also interviewed local investors and entrepreneurs for his book: *"Silicon Valley Co-Investors: your key to improved deal flow, higher returns, and enlarging your network,"* during the same time.

4. Once the Silicon Valley Growth Syndicate identified potential investors, entrepreneurs and start-up businesses in California, the partners turned to Jane Doe, Chief of Operations for the Syndicate, to manage the relationships with these mostly male-led start-up businesses and prospective investors. Her job duties included: publicity and social media presence for Silicon Valley Growth Syndicate; network and relationship-building for potential investments for Silicon Valley Growth Syndicate; communication with Silicon Valley Growth Syndicate's Fund One investors regularly; email account, LinkedIn account, and Angel List account management; and entertainment for guests, customers, investors, prospective investors, business partners and others related to Silicon Valley Growth Syndicate.

5. Despite her extensive duties as the Syndicate's Chief of Operations, Jane Doe was brand new to the investment business when she joined. In fact, the Silicon Valley Growth Syndicate was her first full-time employment after college.

6. Around the end of her undergraduate studies, between October 2015 and September 2016, Silicon Valley Growth Syndicate partner McNutt began recruiting Jane Doe for employment at children's soccer games where he offered her various forms of work, including babysitting, dog sitting, and modeling. At that time, he was in his early 60s. Doe was barely an adult. He eventually offered her an internship with the Syndicate. From her intern role, the Syndicate partners offered Doe the Chief of Operations position.

7. Soon after starting work with the Syndicate, Jane Doe realized where she fit into the business model for the investment group. She was required to travel with male partners, attend dinners and other networking events such as cocktail parties and happy hours wearing a dress and high heels, visit beaches and pools wearing bathing suits, and flatter them and other men associated with the group.

8. Also, as part of the job, Syndicate partner McNutt asked for massages from Doe. Doe eventually discovered that McNutt possessed secret photos of Doe and other young women taken without their consent and then shared them. On one occasion, McNutt sent one bikini photo of Doe

1  (unbeknownst to her) via text message to a man in California who said she was "hot." Then, the man
2  promptly offered to "fly her out to CA." When Doe did not respond to the man in California, McNutt
3  invited him to a conference in New Orleans, Louisiana, and said he would bring Doe as an incentive for
4  the other man to attend.
5       9.     Syndicate partner McNutt sexually harassed and assaulted Doe in California.
6       10.    Doe then filed a complaint with the California Department of Fair Employment and
7  Housing, alleging sexual harassment and assault claims under California law, which led to this lawsuit.

## PARTIES

9       11.    Plaintiff DFEH is the state civil rights department charged with prosecutorial authority to
10 investigate, mediate, and litigate civil rights enforcement actions. (Gov. Code, § 12930 et seq.) The
11 Department enforces the Fair Employment and Housing Act ("FEHA") Government Code section 12900
12 et seq. and Civil Code section 51.9, and may file civil complaints on behalf of itself and persons
13 aggrieved by sexual harassment and sex discrimination, among other claims, in state and federal courts.
14      12.    At all times relevant to this complaint, Jane Doe ("Doe") was an "employee" within the
15 meaning of the applicable statutes. (Gov. Code, §§ 12926 and 12940).
16      13.    Defendant Silicon Valley Growth Syndicate I, L.L.C. ("the Syndicate LLC") is an
17 "employer" subject to subdivision (j) of Government Code section 12940, and a "person" subject to
18 Civil Code section 51.9. Although the Syndicate LLC was headquartered in San Mateo County when the
19 Department initiated its investigation, by the conclusion, it was headquartered in San Francisco County.
20      14.    Defendant Silicon Valley Growth Syndicate Fund I, L.P. ("the Syndicate Fund") is an
21 "employer" subject to subdivision (j) of Government Code section 12940, and a "person" subject to
22 Civil Code section 51.9. Although the Syndicate Fund was headquartered in San Mateo County when
23 the Department initiated its investigation, by the conclusion it was headquartered in San Francisco
24 County.
25      15.    The Syndicate I and the Syndicate Fund are collectively referred to herein as "the
26 Syndicate."
27      16.    Since its founding in 2012, the Syndicate has invested millions of dollars in start-up
28 businesses. As of 2016, forty-two of its investments were in California-based businesses. As of 2016,

-4-

*Dept. Fair Empl. & Hous. v. Silicon Valley Growth Syndicate I, L.L.C.., et al.* (Doe)
First Amended Civil Rights Complaint - 19-cv-04204-RS

1  the Syndicate had "a team of 34 investors and 11 mentors" in its group. In May 2018, it invested $10.4
2  million in a healthcare startup based in San Francisco, California.
3          17.     Defendant International Direct Mail Consultants, Inc., d.b.a. International Direct
4  Marketing Consultants, Inc. ("IDMC") was Doe's joint employer. IDMC is an "employer" subject to
5  subdivision (j) of Government Code section 12940 and a "person" subject to Civil Code section 51.9.
6  Defendant IDMC is based in Dallas, Texas.
7          18.     Defendant Lee William McNutt ("McNutt") is a co-founder of Silicon Valley Growth
8  Syndicate and the owner of IDMC. Defendant McNutt is a resident of Dallas, Texas.
9          19.     Defendant William Bunker ("Bunker") is a co-founder of the Syndicate. Public records
10 indicate that Bunker has lived in various locations in the United States, including Dallas, Texas. Public
11 records suggest that Bunker resided in California from approximately 2005 until late 2018 or early 2019.
12 At the time of the events alleged herein, Bunker principally resided in California.
13         20.     Defendant McNutt and Defendant Bunker are the points of contact for the Syndicate.
14         21.     Defendant Russell Lewis is a co-founder of the Syndicate. He was the Director of the
15 Board for Carbite Golf, a company based in Carlsbad, California; and for Tungsten Heavy Powder, a
16 company based in San Diego, California. Lewis is the founder and chairman of Rhino Linings
17 Corporation, a company based in San Diego, California. In addition, Lewis is a member of the
18 Entrepreneurial Management Center at San Diego State University. At the time of the events in
19 question, Lewis resided in Rancho Santa Fe, California.
20         22.     According to the Syndicate's website, Defendants Bunker and Lewis are two of three
21 permanent members of the Syndicate's investment committee. The third member rotates among its
22 executives and mentor board members.
23         23.     The true names of Does One through Ten are unknown to the Department at this time.
24 The Department sues these defendants by fictitious names pursuant to California Code of Civil
25 Procedure section 474. The Department will amend this complaint to allege their true names and
26 capacities when ascertained. Each of the Doe defendants is legally responsible for the injuries and
27 damages alleged in this complaint.
28

24. The Department is informed and believes and alleges that, at all times mentioned, each and every defendant is and was, in doing the things complained of, the agent of their co-defendants and was acting within the scope and authority of such agency, and that each and every defendant is jointly and severally responsible and liable to the real party for the damages alleged.

25. The Department charges defendants, and each of them, with unlawful harassment of Doe based on her sex, in violation of Government Code section 12940, and with a violation of her personal rights, in violation of Civil Code section 51.9.

**PROCEDURAL HISTORY, JURISDICTION, AND VENUE**

26. The Department incorporates and realleges all previous allegations as if fully set forth herein.

27. The Department files this action pursuant to its authority under Government Code sections 12965.

28. Venue is proper in this judicial district under 28 U.S.C. section 1391, subdivision (b)(3) and Government Code section 12965, subdivision (a), because the Syndicate and its partners have substantial contacts with this judicial district and because the Syndicate's base of operations was in the County of San Francisco by the conclusion of the investigation.

29. Jane Doe filed a pre-complaint inquiry with the Department on or about July 27, 2018 and was interviewed by an investigator on or about August 23, 2018. The Department sent her the complaint for her signature on or about September 4, 2018.

30. Doe submitted her verified discrimination complaint to the Department on or about September 5, 2018. The Department properly served the administrative complaint on the Syndicate, IDMC, and McNutt.

31. On January 4, 2019, Doe filed an amended administrative complaint, which was properly served on all named responding parties, including Bunker and Lewis.

32. The Department attempted to resolve this matter without litigation. The Department participated in a mandatory dispute resolution session with Defendants as required by California Government Code section 12965 on or about June 17, 2019. The mediation and subsequent settlement discussions were unsuccessful.

-6-

*Dept. Fair Empl. & Hous. v. Silicon Valley Growth Syndicate I, L.L.C.., et al.* (Doe)
First Amended Civil Rights Complaint - 19-cv-04204-RS

33. All conditions precedent to the institution of this lawsuit have been fulfilled.

34. The amount of damages sought by this complaint exceeds the minimum jurisdictional limits of this Court.

## FACTUAL ALLEGATIONS

35. The Department incorporates and realleges all previous allegations as if fully set forth herein.

36. Upon information and belief, the Department alleges that Defendant McNutt has engaged in sexually harassing conduct against female interns and employees for over a decade.

37. McNutt was previously a partner with a Texas-based investment group, Transition Capital Partners. On or about July 25, 2007, the president of Transition Capital Partners sent an email message to McNutt, with the subject line "Problems must stop." The text of the email read:

> I am concerned about your involvement with our interns. As I previously told you, [REDACTED] complained to me about being uncomfortable at your house and now I have heard a similar report about [REDACTED]. As I told you after the [REDACTED] incident, you are to have no further involvement with any TCPIP employees at your house or anywhere else without permission from me or Harold. These activities are not in accordance with expected TCPIP behavior. I have made it very clear to [REDACTED] that the interns are to work at the TCPIP offices and nowhere else.

38. Defendant Bunker was an investor with Transition Capital Partners.

39. In 2010, the Dallas Morning News reported that in 2008, Southern Methodist University barred McNutt from the campus after several students complained about him. Regardless, on February 15, 2010, university campus police arrested McNutt for trespassing.

40. In March 2010, the Dallas Morning News reported that students reported dinner parties where they were pressured to undress in a mirrored room for a massage. One student told the paper that following one such dinner, McNutt followed her to her car and tried to kiss her. The newspaper reported that the students worked for McNutt as interns or as household help.

41. In 2012, defendants McNutt, Bunker, and Lewis formed the Silicon Valley Growth Fund I, L.P. The Syndicate Fund filed a Form D with the Securities and Exchange Commission in 2013 which listed defendants Bunker and Lewis as executive officers, and defendant McNutt as a promoter. Everyone listed 1370 Willow Road, Menlo Park, California 94025 as their address.

-7-

*Dept. Fair Empl. & Hous. v. Silicon Valley Growth Syndicate I, L.L.C.., et al.* (Doe)
First Amended Civil Rights Complaint - 19-cv-04204-RS

42. Defendants McNutt, Bunker, and Lewis formed the Silicon Valley Growth Syndicate I, LLC in September 2013, and shortly thereafter registered to do business in California. The registration provided 395 Vallejo Drive PHA, Millbrae, California 94030 as its principal executive office.

43. In December 2013, the Syndicate LLC filed a corrected registration with the California Secretary of State. The corrected registration listed 1370 Willow Road, Menlo Park, California 94025 as its principal office. The corrected registration listed Bunker, Lewis, and "LWM, II GS Trust, Thomas McNutt Trustee" as its managers or members. Everyone listed the Willow Road address.

44. The Syndicate Fund registered to do business in California on or about January 16, 2014. The registration listed the Syndicate LLC as a general partner. Defendant Bunker signed the registration and listed his title as manager. The registration provided 1370 Willow Road, Menlo Park, California 94025 as its principal office.

45. Doe attended Southern Methodist University, in Dallas, Texas, from 2013 to 2017. While attending school, she babysat for several families in the University Park/Dallas area. Between October 2015 and September 2016, McNutt approached Doe at children's soccer games and offered her various forms of work, including babysitting, dog sitting, and modeling. At that time, he was in his early 60s. He eventually offered her an internship with the Syndicate.

46. In January 2017, Doe began working as an intern for the Syndicate. She was hired to work full time in June 2017. Her first title was Chief of Operations, for Silicon Valley Growth Syndicate, as reflected on her business card.

47. Her employment contract specified that from in or about September 2017 to the conclusion of her employment, Doe's title would be "Vice President, Operations & Communications, Silicon Valley Growth Syndicate." Doe's employment contract was purportedly between IDMC and Doe, but in practice her title and work responsibilities were almost entirely with the Syndicate.

48. The employment agreement specified several areas of responsibility, including creating publicity and enlarging the social media presence for the Syndicate and McNutt's other endeavors, and to assist McNutt "and his friends to uncover, investigate and acquire a control position in one or more lower middle market private companies."

49. The employment agreement included a provision requiring Doe to pay back her most

recent IRA and HSA/Health Insurance contribution if she did not work for twenty-one days after giving notice.

50. Doe's compensation package included a $250 bonus for each speaking engagement she secured for McNutt "in the Dallas area for Silicon Valley Growth/tech startup business."

51. The compensation package also included a bonus of $1,000 "each time Mr. McNutt and his friends invest in a lower middle market company."

52. The employment agreement also gave Doe the title of Chief of Staff of McNutt's non-profit, State Funeral for World War II Veterans.

53. The employment agreement required Doe to travel out of town for work.

54. In July 2017, McNutt required Doe to accompany him to Fort Lauderdale, Florida. While there, McNutt took her to the beach and on a friend's boat. During and after the trip, McNutt regularly subjected Doe to unwanted touching by holding her hands, grabbing her forearms while speaking with her, and touching her thigh while driving. Doe indicated that the behavior was unwanted by sliding away, pulling away, bringing up his wife and children in conversation, or discussing work.

55. On or about August 15, 2017, McNutt gave Doe an iPad to use for work. Doe later discovered on the iPad several close-up photos taken of her in a bathing suit while in Fort Lauderdale, which were taken without Doe's knowledge and consent. She also discovered multiple screenshots he had saved of advertisements for hidden spy cameras. In addition, continually during the course of her employment, the iCloud stream was updated with numerous photographs of other young women, either in underwear or naked, taken from angles that suggested the photographs were not taken with permission.

56. Doe considered resigning, but was afraid McNutt would retaliate against her. She began looking for other jobs.

57. On or about August 17, 2017, McNutt required Doe to travel with him to Reno, Nevada, for a convention pertaining to the World War II Veterans non-profit, State Funeral for World War II Veterans, of which he is a co-founder and chairman. He required her to wear a dress and high heels, and joked with other men about her appearance.

58. While in Reno, McNutt bought passes to a nearby spa. He asked that she go to the

relaxation room with him, where he pulled down her robe to expose her torso and began massaging her shoulders and back with oil. He stopped when another couple entered the room. Doe later discovered that while at the spa, McNutt had taken multiple covert photos of her, which he later texted to friends.

59. Doe captured a screenshot of a text exchange between McNutt and another man in which McNutt forwarded a video and image of Doe in a bikini. In the text, McNutt (whose messages are on the right side in blue) and the other man (whose messages are in grey on the left side) discuss flying Doe to California:



60. Doe also discovered a photo McNutt had taken of her birth control pills.

61. Doe did not want to travel further and considered canceling the trip to California the following week, during which she was expected to lead the annual meeting for the Syndicate. The meeting was scheduled to take place in the San Diego area because Lewis was based there.

62. In or about August 26 to 29, 2017, Doe traveled to La Jolla, California as required for her employment.

63. Doe arrived on a Saturday, and was invited to go to the Del Mar Racetrack to watch the horse races. While in the track restaurant, McNutt reached under the table to hand her money to bet on the horse races, which he pushed between her thighs.

64. Doe and McNutt stayed in the area. McNutt reserved a two-bedroom Airbnb.

65. On or about August 27, 2017, McNutt took Doe to Black's Beach in La Jolla, California. The beach is a nude beach. McNutt did not inform Doe of the name or location of the beach, or that it was a nude beach, until they had arrived at the beach. McNutt repeatedly asked Doe to drink alcohol. He took multiple walks on the beach, during which he would remove his bathing suit and walked within her field of vision. He told her to keep the trip private.

66. That evening, McNutt took Doe to a comedy show. When they returned to the Airbnb, McNutt told her to put on shorts. After she changed, he asked her to lie down so he could give her a massage. He placed his hands under her shorts, and massaged her buttocks, placing his fingers close to her genitals. The touching was unwanted and made her feel terrified and incredibly unsafe. She was afraid he would become aggressive.

67. McNutt stated it was his turn, removed his shirt, and poured oil on his back. She went to her room, locked the door, and pushed the night table in front of the door.

68. Doe considered leaving the trip early. When they returned to the Airbnb the following night, she told McNutt that she needed to make a phone call, and then hid outside for several hours. Finally, she sent her friend the apartment address, went inside, locked her door, and again pushed the nightstand in front of it.

69. In the months following the California trip, Doe took measures to protect herself. During a trip in the fall, she agreed to travel only because an intern also traveled. On another trip, McNutt refused to provide hotel accommodations and insisted that they stay in a two-bedroom rental home because he claimed his family would join him after Doe left. He requested Doe to pack a swimsuit, but she did not.

70. In or around January 2018, Doe requested private accommodations for a trip to Florida. McNutt stated that she could either stay in his one bedroom condominium, or not travel. Although Doe perceived this statement as a threat that McNutt would terminate her employment if she did not comply, she refused to travel. Following this incident, McNutt behaved coldly toward Doe.

71. In or about March 2018, counsel for Doe sent a demand and document preservation notice to McNutt, outlining various violations of California, Florida, and Texas laws. In the letter, counsel suggested that Doe be on paid leave until the issues set forth were resolved.

72. On or about June 1, 2018, McNutt informed Doe that her contract would not be renewed.

73. On or about March 4, 2019, the Syndicate LLC cancelled its registration to do business in California.

74. On or about June 3, 2019, the Syndicate Fund cancelled its registration to do business in California.

**FIRST CAUSE OF ACTION**
**Harassment Based on Sex**
**(Gov. Code, § 12930, subd. (f); Gov. Code, § 12940, subd. (j))**
**(Against defendants Silicon Valley Growth Syndicate I, L.L.C.; Silicon Valley Growth Syndicate Fund I, L.P.; International Direct Mail Consultants, Inc., d.b.a. International Direct Marketing Consultants, Inc.; Lee William McNutt)**

75. The Department incorporates and realleges all previous allegations as if fully set forth herein.

76. Government Code section 12940, subdivision (j), states that it is unlawful for an employer to harass an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract, because of, *inter alia*, that person's sex.

77. Defendant McNutt routinely subjected Doe to unwelcome touching, offensive comments, and other misconduct, so severe that it created a hostile work environment.

78. Defendants the Syndicate, International Direct Marketing Consultants, Bunker, and Lewis knew or should have known of the conduct and failed to take immediate and appropriate action.

79. Defendants' acts constitute unlawful harassment of Doe due to her sex in violation of Government Code section 12940, subdivision (j)(1).

80. As a result of defendants' unlawful employment practices, Doe suffered and continues to suffer emotional distress, including but not limited to, emotional pain, humiliation, embarrassment, belittlement, sadness, and mental anguish, in an amount to be determined at trial.

81. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Doe and in conscious disregard of her rights.

82. Defendants engaged in, and by their refusal to comply with the law, demonstrated they will continue to engage in, the pattern or practice of unlawful employment discrimination described unless they are enjoined pursuant to the police power granted by Government Code sections 12920 and

12920.5, from failing or refusing to comply with the mandates of the FEHA, Government Code section 12900 et seq.

83. Unless defendants are enjoined from failing or refusing to comply with the mandates of the FEHA, Doe and other persons' right to seek or hold employment free of unlawful discrimination will continue to be violated.

84. Plaintiff the Department lacks any plain, speedy, adequate remedy at law to prevent such harm, injury, and loss, which is the subject of this complaint and will continue until this Court enjoins the unlawful conduct and grants other affirmative relief as prayed for herein.

**SECOND CAUSE OF ACTION**
**Violation of Personal Rights**
**(Gov. Code, § 12930, subd. (f); Civ. Code, § 51.9; Gov. Code, § 12948)**
**(As to all defendants)**

85. The Department incorporates and realleges all previous allegations as if fully set forth herein.

86. Civil Code section 51.9 imposes personal liability on investors for the sexual harassment of persons who are subjected to sexual advances, solicitations, sexual requests, demands for sexual compliance, or other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe. (Civ. Code, § 51.9, subd. (a).)

87. Doe was party to a contract with Defendant International Direct Marketing Consultants that gave her a title with Defendants the Syndicate. Doe's work responsibilities were almost entirely with the Syndicate. Beginning in January 2017, there existed a business and professional relationship between Doe and Defendants.

88. Beginning in or about July 2017, and continuing through March 28, 2018, on a consistent, continuous, and regular basis, McNutt made sexual advances, solicitations, and sexual requests, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender. These advances were unwelcome and pervasive or severe.

89. The nature of this conduct is more thoroughly described in paragraphs 54 through 70, set forth above and incorporated herein by this reference.

90. As a result of the conduct described in paragraphs 54 through 70, Doe suffered and

continues to suffer emotional distress, including but not limited to, emotional pain, humiliation, embarrassment, belittlement, sadness, and mental anguish, in an amount to be determined at trial.

91. In doing the acts alleged in this complaint, McNutt knew or should have known that the actions were likely to injure Doe. Plaintiff is informed and believes that McNutt intended to cause injury to Doe and acted with willful and conscious disregard of her rights as secured by Civil Code section 51.9 and Government Code section 12948. Thus, plaintiff is therefore entitled to recover exemplary damages on behalf of Doe pursuant to Civil Code sections 51.9 and 52. Plaintiff is also entitled to recover attorney's fees pursuant to Civil Code sections 51.9 and 52, as well as costs of suit.

92. In allowing McNutt to bestow a Syndicate title on Doe and engage her services to further the purpose of the Syndicate, Lewis and Bunker encouraged McNutt, and allowed him to continue the despicable conduct in which he has engaged, in violation of Civil Code section 52, subdivision (b) and Government Code section 12948.

**THIRD CAUSE OF ACTION**
**Failure to Take All Reasonable Steps to Prevent Harassment**
**(Gov. Code, § 12930, subd. (f); Gov. Code, § 12940, subd. (k))**
**(Against defendants Silicon Valley Growth Syndicate I, L.L.C.; Silicon Valley Growth Syndicate Fund I, L.P.; International Direct Mail Consultants, Inc., d.b.a. International Direct Marketing Consultants, Inc.; Lee William McNutt)**

93. The Department incorporates and realleges all previous allegations as if fully set forth herein.

94. Government Code section 12940, subdivision (k), provides that it is an unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent harassment and discrimination from occurring. Defendants' conduct, as described above, constitute a failure to take all reasonable steps necessary to prevent harassment and discrimination in violation of Government Code section 12940, subdivision (k).

95. Defendants failed to take all reasonable steps necessary to prevent discrimination and harassment from occurring. Defendants failed to develop any anti-discrimination and anti-harassment policies. Defendants failed to provide training to its partners, owners, managers, supervisors, employees, associates, clients, investors, interns, and/or third parties on how to identify, report, and prevent sexual harassment and discrimination.

96. Defendants failed to prevent harassment and discrimination by its partners and associates against Doe on account of her sex.

97. As a direct result of defendants' unlawful conduct, Doe suffered economic injuries, including but not limited to lost wages and benefits, in an amount to be proven at trial.

98. As a direct result of defendants' unlawful conduct, Doe suffered emotional distress, including but not limited to, emotional pain, suffering, inconvenience, mental anguish, and humiliation, in an amount to be proven at trial.

99. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Doe and in conscious disregard of her rights.

## JURY TRIAL DEMANDED

100. The Department demands trial of all issues by jury.

## PRAYER FOR RELIEF

### All Causes of Action

**WHEREFORE**, the Department prays that this Court issue judgment in favor of the Department and the real party in interest, Jane Doe, and order defendants to do the following:

1. A declaratory judgment that the practices complained of in this complaint are unlawful and violate the Fair Employment and Housing Act, Government Code section 12940, subdivisions (j) and/or (k);

2. A declaratory judgment that the practices complained of in this complaint are unlawful and violate California Civil Code section 51.9;

3. To cease and desist from harassing other employees and other persons because of sex, or any other protected basis;

4. To pay to Doe compensatory damages for her emotional distress, mental anguish, pain and suffering, and other emotional injury resulting from defendants' unlawful conduct, according to proof, with interest at the applicable legal rate;

5. To pay Doe punitive damages according to proof;

6. To adopt written policies and procedures consistent with the prohibitions against discrimination and/or harassment in employment set forth in the Fair Employment and Housing Act and

to train all managers, supervisors, rank and file employees, investors, and entrepreneurs regarding such policies and procedures;

      7. Pay costs, including reasonable attorney fees, to the Department as provided by statute; and

      8. For such other relief as the Court deems just and proper.

Dated: August 16, 2019

DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

By: *[signature: Melanie J. Proctor]*
MELANIE L. PROCTOR
Associate Chief Counsel
Attorney for the Department

-16-
*Dept. Fair Empl. & Hous. v. Silicon Valley Growth Syndicate I, L.L.C.., et al.* (Doe)
First Amended Civil Rights Complaint - 19-cv-04204-RS